Chester J. REED, Plaintiff,

v.

**PRUDENTIAL SECURITIES INCORPORATED and Scott A. Jaffe, Defendants.**

Civ. A. No. H–93–819.

United States District Court, S.D. Texas.

Feb. 3, 1995.

Wayne C. Fox; Kenneth T. Fibich; and Karen M. Zuckerman, McFall, Sherwood & Sheehy, Houston, TX, for plaintiff.

David Sterling and Bill Kroger, Baker & Botts, Houston, TX, for defendants.

## MEMORANDUM AND ORDER

CRONE, United States Magistrate Judge.

Pending before the court is Defendants Prudential Securities Incorporated ("Prudential") and Scott A. Jaffe's ("Jaffe") Motion for Summary Judgment (Docket Entry # 35). Defendants seek summary judgment on Plaintiff Chester J. Reed's ("Reed") claims of common law fraud, federal securities law violations, state securities law violations, breach of fiduciary duty, and breach of contract. Having reviewed the motion, the submissions of the parties, the pleadings, and the applicable law, this court is of the opinion that the defendants' motion for summary judgment should be granted in part and denied in part.

### I. *Background.*

Reed is a real estate investor who has invested in real estate extensively in Harris County, Texas, since 1952. Jaffe is a Vice President of Investments at the Prudential office in Tampa, Florida. Between 1988 and 1990, Jaffe solicited Reed over the telephone to invest large sums of money in the stock market. At Jaffe's suggestion, Reed opened a nondiscretionary brokerage account with Prudential on July 21, 1989, with Jaffe serving as Reed's broker.

During the next two years, Reed invested in a number of stocks through his Prudential account, including Tseng Lab, Inc., QMS, Inc., Great Northern Nekoosa, International Paper, National Media Corporation, American Southwest Mortgage, and Key Tronic Corporation. In April 1990, Jaffe told Reed about AT & E Corporation ("AT & E") and its plans to develop and market a wristwatch pager. At that time, shares of AT & E were publicly traded over the American Stock Exchange. Before recommending AT & E stock, Jaffe spoke with members of the company's senior management and reviewed reports on AT & E written by market analysts in addition to documents filed by AT & E with the Securities & Exchange Commission ("SEC"). Jaffe also sent Reed a significant amount of written material on AT & E, including press releases issued by AT & E, research and analyst reports by firms other than Prudential, and copies of AT & E's SEC filings.

Between May 9, 1990, and May 30, 1990, Reed purchased 30,000 shares of AT & E stock. Reed purchased an additional 10,300 shares of AT & E on June 1, 1990, and another 10,000 shares on June 11, 1990. After each purchase, Reed received a confirmation notice from Prudential detailing the purchase. In addition, Reed received a monthly account statement which contained information about each of Reed's purchases during the month, including the number of shares purchased in each company, the price paid, and the number of stock certificates delivered to Reed. When Reed purchased AT & E stock on May 9, 1990, the price was $17.25 per share. The price of AT & E stock rose with each of Reed's subsequent purchases. In fact, on June 11, 1990, AT & E stock closed at $24.125 per share, up forty percent in less than four weeks.

On June 12, 1990, AT & E officially unveiled its product at a news conference in Portland, Oregon. The price of AT & E stock began to drop immediately after the unveiling. On July 24, 1990, the price was down to $14.125 per share, and by October 1, 1990, the stock was selling at $6.375 per share. Reed sold 5,000 shares of his AT & E stock on July 24, 1990, when the price fell to $14.125 per share. On August 3, 1990, however, he purchased an additional 5,000 shares of AT & E.

In September 1990, Reed began to sell his stock in mass quantities. For instance, on September 10, Reed sold 7,600 shares at $10 per share. He sold an additional 12,000 shares at $6.375 per share and 13,000 shares

at $6.00 per share on October 1, 1990. Between October 2, 1990, and October 5, 1990, Reed sold the remaining 12,700 shares at prices fluctuating between $7.00 per share and $6.375 per share.

On February 15, 1993, Reed filed suit against the defendants alleging claims of common law fraud, federal securities law violations, state securities law violations, breach of fiduciary duty, and breach of contract. The defendants presently move for summary judgment on Reed's claims.

## II. *Analysis.*

### A. The Applicable Standard.

Rule 56(c) provides that "[summary] judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Williams v. Adams*, 836 F.2d 958, 960 (5th Cir.1988). Once a proper motion has been made, the non-moving party may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing the existence of a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Anderson*, 477 U.S. at 257, 106 S.Ct. at 2514–15; *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). Summary judgment is mandated if the non-movant fails to make a showing sufficient to establish the existence of an element essential to the nonmovant's case on which it bears the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. at 2552.

### B. Statute of Limitations.

◼ Defendants argue that plaintiff's federal securities law claims and breach of fiduciary duty claim were filed outside the applicable statutes of limitations and are thus time-barred.

### 1. *Section 10(b) and Rule 10b–5.*

Claims brought pursuant to § 10(b) and Rule 10b–5 of the 1934 Federal Securities Exchange Act must be commenced "within one year after the discovery of the facts constituting the violation and within three years after such violation." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364, 111 S.Ct. 2773, 2782, 115 L.Ed.2d 321 (1991); *Topalian*, 954 F.2d at 1135. The one-year "discovery" limitations period begins to run on the date that the plaintiff discovers or in the exercise of reasonable diligence should have discovered the alleged fraudulent conduct. *See Jensen v. Snellings*, 841 F.2d 600, 606 (5th Cir.1988); *Vigman v. Community Nat'l Bank & Trust Co.*, 635 F.2d 455, 459 (5th Cir.1981); *see also DeBruyne v. Equitable Life Assur. Soc.*, 920 F.2d 457, 466 (7th Cir.1990); *Corwin v. Marney, Orton Inv.*, 843 F.2d 194, 197 (5th Cir. 1988), *cert. denied,* 488 U.S. 924, 109 S.Ct. 305, 102 L.Ed.2d 324 (1988); *Breen v. Centex Corp.*, 695 F.2d 907, 911 (5th Cir.1983); *Summer v. Land & Leisure, Inc.*, 664 F.2d 965, 968 (5th Cir.1981), *cert. denied,* 458 U.S. 1106, 102 S.Ct. 3484, 3485, 73 L.Ed.2d 1367 (1982). It is not necessary for the plaintiff to have actual knowledge of fraud for the limitations period to begin to run. *Lampf, Pleva, Lipkind, Prupis & Petigrow*, 501 U.S. at 363, 111 S.Ct. at 2782; *Jensen*, 841 F.2d at 607; *Ohio v. Peterson, Lowry, Rall, Barber & Ross*, 651 F.2d 687, 694 (10th Cir.), *cert. denied,* 454 U.S. 895, 102 S.Ct. 392, 70 L.Ed.2d 209 (1981); *Klein v. Bower*, 421 F.2d 338, 343 (2d Cir.1970). Rather, "the requisite knowledge that a plaintiff must have to begin the running of the limitations period 'is merely that of the *facts* forming the *basis* of his cause of action,' ... not that of the existence of the cause of action itself." *Jensen*, 841 F.2d at 607 (quoting *Vigman*, 635 F.2d at 459) (emphasis in original); *see also*

*Azalea Meats, Inc. v. Muscat,* 386 F.2d 5, 9 (5th Cir.1967). Accordingly, a potential plaintiff who has discovered facts which would require a reasonable person to inquire further has an affirmative duty to make diligent inquiry to discover fraud. *Jensen,* 841 F.2d at 607; *see also Corwin,* 843 F.2d at 197; *Summer,* 664 F.2d at 968; *Vigman,* 635 F.2d at 459.

◼ Courts apply an objective standard to determine whether a plaintiff has satisfied his duty to exercise reasonable diligence to discover fraud. *Jackson v. Speer,* 974 F.2d 676, 679 (5th Cir.1992); *Jensen,* 841 F.2d at 607; *Armstrong v. McAlpin,* 699 F.2d 79, 88 (2d Cir.1983); *Vigman,* 635 F.2d at 459; *Hallman v. Northwestern Nat'l Ins. Co.,* 766 F.Supp. 575, 579 (S.D.Tex.1991); *see also Koke v. Stifel, Nicolaus & Co.,* 620 F.2d 1340, 1343 (8th Cir.1980). Under this standard, a plaintiff must diligently pursue discovery of the claim. *See Jensen,* 841 F.2d at 607. A potential plaintiff is not permitted a "leisurely discovery of the full details of an alleged scheme," nor are investors "free to ignore 'storm warnings' which would alert a reasonable investor to the possibility of fraudulent statements or omissions in his securities transaction." *Id.; DeBruyne,* 920 F.2d at 467; *Cook v. Avien, Inc.,* 573 F.2d 685, 697–98 (1st Cir.1978). An investor who has learned of facts which would cause a reasonable person to inquire further must proceed with a reasonable and diligent investigation and is charged with the knowledge of all facts such an investigation would have disclosed. *Jensen,* 841 F.2d at 607; *In re Beef Indus. Antitrust Litig.,* 600 F.2d 1148, 1171 (5th Cir.1979), *cert. denied,* 449 U.S. 905, 101 S.Ct. 280, 281, 66 L.Ed.2d 137 (1980); *Armstrong,* 699 F.2d at 88.

◼ Applying these principles, courts throughout the United States have held that a sharp drop in the price of stock triggers an investor's duty to make diligent inquiry to discover the existence of possible fraud. *See, e.g., Summer,* 664 F.2d at 969 n. 2; *Buder v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 644 F.2d 690, 693 (8th Cir.1981); *Koke,* 620 F.2d at 1342–45; *Jablon v. Dean Witter & Co.,* 614 F.2d 677, 682 (9th Cir.1980); *Gaudin v. KDI Corp.,* 576 F.2d 708, 712 (6th Cir.

1978); *Hupp v. Gray,* 500 F.2d 993, 995 (7th Cir.1974); *Murray v. Shearson Hayden Stone, Inc.,* 524 F.Supp. 304, 306–07 (N.D.Ga. 1980). For example, in *Tregenza v. Great Am. Communications Co.,* the court held that the plaintiff was put on inquiry notice of possible fraud when the stock that he purchased on the broker's representation that it would double in value in less than one year instead fell from a selling price of $12.00 per share to approximately $1.00 per share within a year. *Tregenza,* 823 F.Supp. 1409, 1417 (N.D.Ill.1993), *aff'd,* 12 F.3d 717 (7th Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1837, 128 L.Ed.2d 465 (1994). Similarly, in *Buder,* the court found that the plaintiff's receipt of quarterly reports and research reports that revealed a sharp drop in market price was sufficient to put the plaintiff on notice of the alleged fraud. *Buder,* 644 F.2d at 693. Likewise, in *Hupp,* a sharp drop in the price of the stock was deemed sufficient to start the limitations period running because the drop in the value of the stock "at the very least, should have aroused suspicion or curiosity on the part of plaintiff." *Hupp,* 500 F.2d at 996.

Here, Reed alleges that Prudential and Jaffe violated § 10(b) and Rule 10b–5 by misrepresenting to him that AT & E stock was a safe, low-risk investment with long-term growth potential that conformed with Reed's instructions to Jaffe to invest his funds in conservative, low-risk stocks. He further claims that Jaffe misrepresented to him that "AT & E would keep going up." In fact, Reed saw the price of AT & E stock rise rapidly from $17.25 per share at his initial purchase to $24.125 per share prior to the unveiling of the product on June 12, 1990, just one month later. Reed also saw the price plummet sharply to a low of $6.00 per share by October 1, 1990. Reed sold his last share of AT & E stock on October 5, 1990, and thus was apprised of his $611,487.75 loss as of that date. Such drastic fluctuations in stock price over a short period of time are hardly the hallmark of the safe, conservative investment Reed allegedly was assured by Jaffe. Therefore, Reed was put on notice of potential fraud and violation of the securities laws by the rapid drop in the price of AT &

E stock and had a duty to make diligent inquiry commencing no later than October 5, 1990, to determine whether he had viable claims against the defendants.

Reed argues, however, that a drop in the price of stock is insufficient to put an investor on notice of potential fraud. In support, Reed cites *Summer*, where the Court of Appeals for the Fifth Circuit said, in dicta, "[w]e can conceive of several factual situations in which a price decline, under the circumstances here, would not be indicative of fraud in the least, *e.g.*, a depressed real estate market caused either by tight money or recession." *Summer*, 664 F.2d at 969. Yet, in *Summer*, the plaintiff sued the issuing company and its accountants and underwriter, alleging that the defendants misrepresented the company's true financial condition. *Id.* at 969–70. The case at bar involves misrepresentations relating to the value of AT & E stock and that investment in AT & E would produce a stable income with minimal risk. Thus, the dicta in *Summer* are inapposite to the circumstances involved in this case. In fact, in *Summer*, the court noted that sharp declines in the value of a security shortly after a representation that the security will produce a stable income without any risk "would in fact tend to indicate that the representation was false." *Id.* at 969 n. 2. In reaching this conclusion, the Fifth Circuit relied on *Buder, Koke, Jablon, Gaudin,* and *Hupp*, all cases this court relies upon as well.

Consequently, the one-year statute of limitations on Reed's § 10(b) and Rule 10b–5 claims began to run no later than October 5, 1990. Reed, however, did not file his complaint until February 15, 1993, over two years after he discovered or should have discovered the facts constituting the alleged violation of the federal securities laws. Accordingly, Reed's § 10(b) and Rule 10b–5 claims are time-barred.

### 2. Section 12(2).

■ An action under § 12(2) of the Federal Securities Act of 1933 must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m (1988). The one-year statue of limitations begins to run when the plaintiff discovers, or in the exercise of reasonable diligence, should have discovered the alleged violation. *DeBruyne*, 920 F.2d at 465–66; *Kennedy v. Josephthal & Co., Inc.*, 814 F.2d 798, 802 (1st Cir.1987); *Tregenza*, 823 F.Supp. at 1413. Thus, a plaintiff has an affirmative duty to make reasonable inquiry into the discovery of fraud under § 12(2). *DeBruyne*, 920 F.2d at 465–66; *Tregenza*, 823 F.Supp. at 1413–14. The plaintiff's affirmative duty to inquire into facts constituting fraud under § 10(b) and Rule 10b–5 of the 1934 Federal Securities Exchange Act. *Topalian*, 954 F.2d at 1133–35. Thus, for the reasons discussed above, Reed's claims under § 12(2) are likewise time-barred.

### 3. Breach of Fiduciary Duty.

■ Under Texas law, a cause of action for breach of fiduciary duty is subject to a two-year statute of limitations. *Kansa Reinsurance Co., Ltd. v. Congressional Mortgage Corp.*, 20 F.3d 1362, 1374 (5th Cir.1994); *FDIC v. Dawson*, 4 F.3d 1303, 1307 (5th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2673, 129 L.Ed.2d 809 (1994); *Russell v. Board of Trustees of Firemen, Policemen & Fire Alarm Operators' Pension Fund*, 968 F.2d 489, 492–93 (5th Cir.1992); *Hoover v. Gregory*, 835 S.W.2d 668, 676 (Tex.App.—Dallas 1992, writ denied); *Russell v. Campbell*, 725 S.W.2d 739, 744 (Tex.App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.). The limitations period for breach of a fiduciary relationship begins to run when the breach is perpetrated or, if the breach is concealed, from the time it was discovered or could have been discovered by the exercise of reasonable diligence. *Id.* at 748; *Gaynier v. Ginsberg*, 715 S.W.2d 749, 755 (Tex.App.—Dallas 1986, writ ref'd n.r.e.), *aff'd after appeal and remand*, No. 05–92–00200–CV, 1994 WL 400989, at *2 (Tex.App.—Dallas Aug. 2, 1994); *see generally Bayou Bend Towers Council of Co–Owners v. Manhattan Constr. Co.*, 866 S.W.2d 740, 742–43 (Tex.App.—Houston [14th Dist.] 1993, writ denied); *Redman Indus., Inc. v. Couch*, 613 S.W.2d 787, 789–90 (Tex.Civ.App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.).

Reed contends that the defendants breached a fiduciary obligation by misrepresenting the safety of AT & E stock and embarking on a speculative program that substantially impaired his investment. Reed was put on notice, however, that AT & E was not a safe investment and of its speculative nature, when the value of its shares rose precipitously during May and early June 1990 and then dropped from $24.125 in June 1990 to $6.00 in October 1990. Thus, by October 1990, Reed, through the exercise of reasonable diligence, should have discovered the existence of facts giving rise to an action for breach of fiduciary duty. The nature of the relationship between Reed and Jaffe was not so close, nor Reed so unsophisticated, to excuse him from using diligence in investigating the situation. *See Wakefield v. Bevly,* 704 S.W.2d 339, 346 (Tex.App.—Corpus Christi 1985, no writ). Thus, the statute of limitations on Reed's breach of fiduciary duty claim began to run no later than October 5, 1990, when he realized the extent of his loss from his investment in AT & E stock.

Reed, however, did not file his complaint in this action until February 15, 1993, more than two years and four months after the limitations period began to run. Therefore, Reed's claim for breach of fiduciary duty is time-barred.

## C. Applicability of § 12(2) to Secondary Market Transactions.

Moreover, without regard to whether Reed's § 12(2) claims are time-barred, the defendants assert that Reed's claims under § 12(2) should be dismissed because § 12(2) applies only to initial offerings, not to transactions in the secondary market, such as those at issue here.

While the Fifth Circuit has not addressed this issue, there is overwhelming authority from courts of other jurisdictions holding that § 12(2) applies only in the context of initial offerings of securities. *See First Union Discount Brokerage Serv., Inc. v. Milos,* 997 F.2d 835, 843–44 (11th Cir.1993); *Ballay v. Legg Mason Wood Walker, Inc.,* 925 F.2d 682, 687–91 (3d Cir.), *cert. denied,* 502 U.S. 820, 112 S.Ct. 79, 116 L.Ed.2d 52 (1991); *Fujisawa Pharmaceutical Co., Ltd. v. Kap-*

*oor,* 814 F.Supp. 720, 728 (N.D.Ill.1993); *Comeau v. Rupp,* 810 F.Supp. 1127, 1154 (D.Kan.1992); *Budget Rent A Car Sys., Inc. v. Hirsch,* 810 F.Supp. 1253, 1258 (S.D.Fla. 1992); *Hedden v. Marinelli,* 796 F.Supp. 432, 435 (N.D.Cal.1992); *Newman v. Comprehensive Care Corp.,* 794 F.Supp. 1513, 1524–25 (D.Or.1992); *In re Delmarva Sec. Litig.,* 794 F.Supp. 1293, 1309 (D.Del.1992); *Bennett v. Bally Mfg. Corp.,* 785 F.Supp. 559, 561–62 (D.S.C.1992); *Bank of Denver v. Southeastern Capital Group, Inc.,* 763 F.Supp. 1552, 1559 (D.Colo.1991); *T. Rowe Price New Horizons Fund, Inc. v. Preletz,* 749 F.Supp. 705, 708 n. 1 (D.Md.1990); *Grinsell v. Kidder, Peabody & Co.,* 744 F.Supp. 931, 932–34 (N.D.Cal.1990); *Leonard v. Stuart–James Co.,* 742 F.Supp. 653, 658 (N.D.Ga.1990); *Mix v. E.F. Hutton & Co.,* 720 F.Supp. 8, 10–12 (D.D.C.1989).

The Third Circuit was the first Court of Appeals to consider whether § 12(2) applies to secondary market transactions. *See Ballay,* 925 F.2d at 689. In *Ballay,* investors and their stock brokers sued a broker for misrepresentations involving the recommendation and sale of stock. *Ballay,* 925 F.2d at 687–89. The court held that § 12(2) does not apply to secondary market transactions because: (1) § 12(2)'s language limits its scope to initial distributions; (2) § 12(2) is structurally positioned after §§ 11 and 12(1), which govern the registration of securities and create civil liability for sales of unregistered securities, and before § 13, which establishes a limitations period for §§ 11 and 12; and (3) the United States Supreme Court's holding in *United States v. Naftalin,* 441 U.S. 768, 99 S.Ct. 2077, 60 L.Ed.2d 624 (1979) that § 17(a) of the Securities Act applies to transactions in secondary markets, does not extend to § 12(2) because the language in § 12(2) is materially distinct from that of § 17(a). *First Union Discount Brokerage Serv.,* 997 F.2d at 843 (construing *Ballay,* 925 F.2d at 687–92).

Courts subsequently faced with the issue have followed the reasoning in *Ballay,* holding that § 12(2) generally does not apply to secondary market transactions. *See Fujisawa Pharmaceutical Co., Ltd.,* 814 F.Supp. at 729; *Hedden,* 796 F.Supp. at 435–36; *Budget*

*Rent A Car Systems, Inc.,* 810 F.Supp. at 1257. In *Hedden,* however, the court indicated that the sale of large blocks of stock on the secondary market by a corporate insider with control of the corporation may be an exceptional case warranting the application of § 12(2). *Fujisawa Pharmaceutical Co., Ltd.,* 814 F.Supp. at 730 (citing *Hedden,* 796 F.Supp. at 435–36). In *Budget Rent A Car, Inc.,* the court found that the *Hedden* exception does not apply unless the stock is distributed through a controlling distributor, all of the outstanding stock of the corporation is put up for sale, and the stock is offered to the public. *Budget Rent A Car, Inc.,* 810 F.Supp. at 1257.

Only a minority of district courts, none from this circuit, have held that § 12(2) applies to transactions in the secondary market. *See Farley v. Baird, Patrick & Co.,* 750 F.Supp. 1209, 1221 (S.D.N.Y.1990); *In re Ramtek Sec. Litig.,* No. C–88–20195–RPA, 1990 WL 157391, at *6 (N.D.Cal. Sep. 7, 1990); *Elysian Fed. Sav. Bank v. First Interregional Equity Corp.,* 713 F.Supp. 737, 751 (D.N.J.1989); *Wilko v. Swan,* 127 F.Supp. 55, 59–60 (S.D.N.Y.1955). Each of these decisions, however, pre-date *Ballay.* Thus, the Third Circuit had access to these decisions, and in fact considered *Wilko,* before reaching its conclusion that § 12(2) does not apply to secondary market transactions. *See Ballay,* 925 F.2d at 691.

Courts throughout the nation have followed the Third Circuit's reasoning in *Ballay,* including the United States Court of Appeals for the Eleventh Circuit, a circuit closely aligned with the Fifth Circuit. *See First Union Discount Brokerage Serv., Inc.,* 997 F.2d at 843–44. This court finds no reason to depart from the majority view under the facts of this case. Although some courts have recognized an exception to the general rule, the transactions at issue here do not fall with the scope of the exception, as the sale of AT & E stock to Reed via the American Stock Exchange does not sufficiently resemble an initial offering. Accordingly, § 12(2) is of no application to this case.

### D. The Texas Securities Act.

■ The defendants further contend that Reed's claims of violation of state securities laws must be dismissed because, like § 12(2) of the Federal Securities Act, the Texas Securities Act is inapplicable to secondary market transactions.

Article 581–6 of the Texas Securities Act specifically exempts application of the Texas Securities Act to securities that were listed upon the American Stock Exchange when offered for sale, or sold, or dealt in by a registered dealer or salesman of a registered dealer. TEX.REV.CIV.STAT.ANN. Art. 581–6 (Vernon Supp.1994). At the time that Reed purchased his AT & E stock, it was traded on the American Stock Exchange. Consequently, the Texas Securities Act does not apply to the transactions at issue here or to any misrepresentations surrounding Reed's purchase of AT & E stock.

Moreover, article 581–33, the civil liability section of the Texas Securities Act, was modeled after § 12(2) of the Federal Securities Act. Comment—1977 Amendment, *reprinted following* TEX.REV.CIV.STAT.ANN. art. 581–33 (Vernon Supp.1994). In fact, cases interpreting the Texas Securities Act rely upon decisions construing § 12(2) because the language is virtually identical. *See Haralson v. E.F. Hutton Group, Inc.,* 919 F.2d 1014, 1031 n. 9 (5th Cir.1990); *MBank Fort Worth N.A. v. Trans Meridian, Inc.,* 820 F.2d 716, 725 (5th Cir.1987); *Anheuser–Busch v. Summit Coffee Co.,* 858 S.W.2d 928, 941 (Tex.App.—Dallas 1993, writ denied). In *Anheuser–Busch,* the Texas Court of Appeals at Dallas held that although the language in the Texas Securities Act is arguably broader than that of § 12(2), "the Texas statute should be applied in accordance with our interpretation of the federal statute." *Id.* Furthermore, in *Haralson,* the Fifth Circuit noted that it had "found no Texas authority interpreting article 581–33(A)(2) that contradicts any of our holdings below with respect to section 12(2)" and applied it in connection with its interpretation of § 12(2).

Thus, Reed's Texas Securities Act claim is without basis, as the transactions in dispute are exempt from its application.

### E. Common Law Fraud and Breach of Contract.

■ With regard to Reed's claims alleging common law fraud and breach of con-

tract, the court finds that there exist outstanding issues of material fact, precluding summary judgment on these claims.

### III. *Conclusion.*

Reed's claims of federal securities law violations under § 10(b) and Rule 10b–5 of the Federal Securities Exchange Act and § 12(2) of the Federal Securities Act, as well as Reed's claim of breach of fiduciary duty, are barred by the applicable statutes of limitations. Reed fails to state viable claims under § 12(2) of the Federal Securities Act or the Texas Securities Act, as they do not apply to secondary market transactions on a recognized stock exchange. Having determined that the defendants are entitled to summary judgment on these bases, the court need not address the defendants' remaining arguments as to these claims.

Accordingly, the defendants' motion for summary judgment with respect to Reed's claims of federal securities law violations, Texas securities law violations, and breach of fiduciary duty are GRANTED.

As to Reed's claims of common law fraud and breach of contract, the defendants' motion for summary judgment is DENIED.

IT IS SO ORDERED.